## IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

**DON BLANKENSHIP,**

     **Plaintiff,**

**v.**                                                                                  **Civil Action No. 19-C-51**

**DONALD TRUMP, JR.; and**
**DOES 1-20 inclusive,**

     **Defendants.**

**SERVE:**    **Donald Trump Jr**
              **Trump Tower**
              **725 5th AVE**
              **New York NY 10022**

---

### SUMMONS

---

     Within **30 days** after service of this Summons on you, exclusive of the day of service, you are required to file and serve an Answer, including any defense or counterclaim, to the Complaint. You must file your Answer with the Mingo County Circuit Court and serve a copy thereof on the following counsel of record:

     **JEFFREY S SIMPKINS ESQ**
     ***SIMPKINS LAW***
     **102 E 2ND AVE**
     **WILLIAMSON WV 25661**

     If you fail to respond, judgment by default will be entered against you for the relief demanded in the Complaint and you will be thereafter barred from asserting in another action any defense or counterclaim that must be asserted in this action.

     Date: 12 June 2019

                                        _____
                                        Circuit Clerk

              By:   _____
                          Deputy Clerk

**EXHIBIT B**

IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

DON BLANKENSHIP,

              **Plaintiffs,**

vs.

DONALD TRUMP, JR.;
and DOES 1-50 inclusive,

              **Defendants.**

Civil Action No.: **19 - C - 51**

ADMITTED TO RECORD
2019 APR 25 PM 2:34
MINGO COUNTY CIRCUIT CLERK

## COMPLAINT

### INTRODUCTION
### A Case of "Weaponized Defamation"

1.     The mainstream media and much of the political establishment today routinely, and with actual malice, sets out to destroy public figures with outright lies.  The competition for viewers is intense and nothing brings in eyeballs like scandal and degradation.  So too is the establishment media's bloodthirsty desire to destroy those with whom they disagree politically. We live in an age of weaponized defamation where lies can be repeated in more ways at more times in more places with more speed than anyone could possibly have imagined even five years ago, much less in 1964 when the seminal case in the area of defamation of public figures was decided.  This lawsuit will help determine whether the media and the political establishment, in this increasingly malevolent and digitized environment, can

continue to tell outright lies about what they consider public figures running for office, as part of their effort to sway elections and tarnish non-establishment candidates, while intentionally putting blinders on, and completely hoodwinking, the American public in the process.

2.      In the 2018 election cycle, plaintiff Don Blankenship (sometimes referred to herein as "Plaintiff") was one of several Republican candidates vying to be the next United States Senator from West Virginia.  Mr. Blankenship personified and epitomized what it is to be a non-establishment candidate for office.  As such, the DC establishment "swamp" and the establishment media united against Mr. Blankenship.  The entire establishment media spectrum – from conservative to liberal, from fringe social media to mainstream media – commenced a search and destroy mission to take out Mr. Blankenship.

3.      Prominent mainstream beltway "swamp" Republicans, led by Senate Majority Leader Mitch McConnell, told all who would listen that Mr. Blankenship had to be stopped at all costs.

4.      McConnell set in motion the wheels of a clandestine campaign – including a "menu of items" –  to destroy Mr. Blankenship and blatantly interfere in a federal election, using among other things, the National Republican Senatorial Committee ("NRSC"), Donald Trump, Jr. (sometimes referred to herein as "Defendant"), and his contacts in the establishment media, including Fox News in particular, to do McConnell's (and in turn, the NRSC's) bidding.

5.      Not to be outdone, the establishment left-wing media, including its leading mouthpieces CNN, MSNBC and The Washington Post, joined in the defamation chorus. They too set out to destroy Mr. Blankenship, and to subvert an election, but for their own particular reasons -- doing so would protect their incumbent Senator of choice, Democrat Joe Manchin (who had been beaten in the

past in both legal and political battles with Mr. Blankenship) -- and also fit perfectly within the leftwing media's tried and true agenda of using certain prominent conservatives as poster boys to paint a false picture of purported conservative evil and depravity across the board.

6.     This toxic environment provided the venue in which multiple news persons disregarded their obligation to report the truth and lied about Mr. Blankenship, reporting *ad nauseum* in the days leading up to the May 8, 2018 West Virginia Primary, that he was a "convicted felon" or had been "imprisoned for manslaughter." Mr. Blankenship is well-acquainted with the rough and tumble of politics. This is not that. Mr. Blankenship *is not and never was a felon* and has never been convicted of a felony, neither manslaughter nor any other. These false claims were not simple insults, but rather were part of a concerted plot by the establishment media and the political establishment to destroy Mr. Blankenship personally and interfere in a federal election.

### Brief Background Leading to the Weaponized Defamation
### of Don Blankenship

7.     Mr. Blankenship was raised in the small West Virginia town of Delorme. He began in the mines, working his way through school as a coal miner. Following graduation, he rose in the coal business from an accounting job to becoming CEO of Massey Energy in 1992. He worked in the business for thirty-eight years. Under his leadership, Massey Energy grew from a small outfit into the largest coal producer in Central Appalachia, which employed thousands of miners, and provided energy to millions of consumers. Mr. Blankenship's leadership helped destroy the coal miner's union, which resulted in the creation of thousands of new jobs and earned Mr. Blankenship the permanent enmity of union boss and Obama minion Richard Trumka.

8.     On April 5, 2010, a tragic explosion at Massey's Upper Big Branch Mine took the lives of twenty-nine miners.  The explosion occurred *just a few hours after* ventilation changes required by the Obama Administration were completed, which cut the mine's airflow in half.  President Obama immediately sought to divert blame from his Administration's culpability, and to continue to curry favor with union boss Trumka (who had visited Obama in the White House more than any other person). Obama purported to show sympathy for the miners' families by holding a press conference only ten days after the explosion -- long before anyone even was able to enter the mine to investigate -- in which the President told the world the explosion was the fault of Massey's management – *i.e.* Don Blankenship.  In fact, a scientific analysis of the explosion itself has ultimately shown that the detonation was caused by ill-advised and ill-conceived ventilation regulations imposed by the Obama Administration's Mine Safety and Health Administration (MSHA) which were completed just hours before the tragedy.

9.     The Obama Justice Department ("DOJ") followed with a politically supercharged and motivated indictment against Mr. Blankenship accusing him of three separate felonies and a misdemeanor.  The Obama Administration detested Don Blankenship.  Mr. Blankenship had long been well-known as the most prolific provider and defender of coal miners' jobs in West Virginia.  He had also almost singlehandedly revived the conservative brand and the Republican party in West Virginia and had long been a vocal critic of Obama.  He was therefore an easy mark for the coal-hating Obama Administration and a target of its unrelenting war on coal.

10.     The aggressive federal prosecution went to trial in October 2015, and Mr. Blankenship *was found innocent by a West Virginia jury on all felony counts*.  He was convicted, however, only *of a misdemeanor*.

11.     A first-time misdemeanant is never (or virtually never) sent to prison, but thanks to the overarching and outrageous pressures brought to bear against him by the government, Mr. Blankenship was sent to prison by the Obama DOJ for one year (the maximum for which any misdemeanant can be sentenced) and served time in prison.  Mr. Blankenship may have been the only prisoner in any federal prison who had been convicted of just a misdemeanor.

12.     The Department of Justice Office of Professional Responsibility has since investigated the conduct of the United States Attorneys who prosecuted Mr. Blankenship -- Booth Goodwin and Steve Ruby.  The OPR found that massive prosecutorial misconduct had occurred in the prosecution of Mr. Blankenship, stating among other things that, "because Ruby and Goodwin recklessly violated the Department's discovery policies regarding the disclosure of discoverable statements, they committed professional misconduct."

### The West Virginia Republican Primary

13.     In 2017, Mr. Blankenship announced his plans to run for the West Virginia Senate seat held by Democrat Joe Manchin. The May 8, 2018 Republican Primary pitted Mr. Blankenship against West Virginia Congressman Evan Jenkins and Attorney General Patrick Morrisey.  Thanks to Mr. Blankenship's longstanding prominence in West Virginia, the significant financial resources he brought to bear, his effective ads and success in debates, by early May 2018, his opponents' internal polls showed Mr. Blankenship had moved into contention.

14.     The potential election of Mr. Blankenship was an anathema to Mitch McConnell and the GOP Establishment.  As Mr. Blankenship rose in the polls, Leader McConnell and his colleagues determined that they would do whatever they could, including lying and smearing to stop Mr. Blankenship from winning the primary.  At or about this time, it was widely reported that McConnell convened

clandestine meetings of the NRSC to formulate a plan, including a "menu" of options, to stop Mr. Blankenship from winning the Primary. Some of these meetings took place in McConnell's office in the Capitol. One attendee, Senator John Thune, the third-ranking member of the Senate leadership, was quoted as "hop[ing] and pray[ing]" that Blankenship would not win the nomination.

### The Defamatory Attacks

15.     What followed next was Mr. Blankenship's conviction by the media not once, but dozens of times, of being a felon.

16.     The desire to stop Mr. Blankenship began to be given voice on April 25, 2018, when Judge Andrew Napolitano appeared on the Fox News Channel program "Outnumbered" and falsely claimed that Mr. Blankenship "went to jail for manslaughter, after being indicted."

17.     Just days later, on April 29, 2018, Kevin McLaughlin – now the NRSC's Executive Director and at that time an ally of Leader McConnell – appeared on CNN and falsely said about Mr. Blankenship: "Well, I mean, pick your poison with this guy, right? He doesn't live in West Virginia, he's a *convicted felon*."[1] CNN had previously reported accurately Mr. Blankenship's felony acquittals and both CNN and Mr. McLaughlin knew this slur was false.

18.     McConnell (among others), by and through his surrogates in and out of the media (including Donald Trump, Jr.), sought to interfere in a Federal election by silencing Mr. Blankenship, prevent him from winning a seat in the United States Senate and using Mr. Blankenship's public figure status to chill his free speech.

---

[1]     In this Complaint, the word "*felon*" and other defamatory utterances have been highlighted in *bold italics*. This emphasis has been added and was not in the original text unless specifically stated.

19.     The defamatory attacks on Mr. Blankenship escalated after he walloped his opponents in a nationally televised May 1, 2018 Fox News Debate, which took place just a week before the Primary.  Polling by Mr. Blankenship's opponents estimated his performance gained him an eight-point lead in the race.

20.     Over the ensuing week, multiple news personalities, lubricated by their disdain for Mr. Blankenship, and some at the direction of McConnell and other GOP leaders, repeatedly and falsely called Mr. Blankenship a "felon" and "convicted felon".  These defamatory statements were made on Fox News and in other venues by conservative commentators.

21.     On May 3, 2018, Defendant Donald Trump, Jr. attended and gave the keynote address at a meeting of high-level NRSC leaders in Florida.  That same evening, Mr. Trump published a tweet to his 3.5 million followers calling Mr. Blankenship a "felon."

22.     Donald Trump Jr. tweeted that Mr. Blankenship was a "felon" after meeting with, and as part of a scheme with, NRSC leaders seeking to prevent Mr. Blankenship's victory in the primary.

23.     Moreover, Defendant's defamatory statement was made in conjunction with reference to the mine disaster and thus, had the additional effect, through inference, implication, *innuendo* and/or insinuation, of further defaming Mr. Blankenship by falsely attributing to him responsibility for murder.

24.     In addition, Mr. Blankenship was repeatedly defamed by the left-leaning mainstream media, including CNN and MSNBC.  Examples include MSNBC's Chris Hayes calling Mr. Blankenship a "felon" on MSNBC at least twice and Joy Reid calling him a "convicted felon" on May 5, 2018.  Others did the same.

25.     The evidence in this case will prove the Defendant acted with actual malice and reckless disregard for the truth.  As a result, Mr. Blankenship has

suffered enormous damages.  Mr. Blankenship possesses a proven record of adding billions of dollars in value to an enterprise.  As Massey's CEO, Mr. Blankenship grew the company from a valuation of $150 million to $7.8 billion (while most others in the marketplace were failing).  The defamation of Mr. Blankenship as a "felon" has so smeared his reputation that he has been prevented from pursuing other businesses and opportunities and generating similar returns of billions of dollars. Because of this harm and a variety other injuries Mr. Blankenship has suffered, he seeks damages in excess of the jurisdictional limit of Mingo County Circuit Court in an amount to be proven at trial.[2]

26.     In addition, Mr. Blankenship seeks substantial punitive damages in an amount to be established at trial.  The purpose of punitive damages is to punish a defendant for outrageous conduct and/or to reform or deter the defendant and

---

[2]     While the evidence will support the requested relief under the prevailing standard of *New York Times v. Sullivan* (and its progeny), scrutiny of that actual malice standard is significantly increasing.  *See for example*, the very recent Opinion of Justice Clarence Thomas (dated February 19, 2019), in which he concurred with the denial of *certiorari* in the case, *McKee v. Cosby, Jr.*, 2019 WL 659764.  Justice Thomas describes at length, how the controlling law (which originated with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 Sc.D. 710, 11 L.Ed.2d 686 (1984)), applies an actual malice standard to public figures ***that was nowhere found in the Constitution or in common law***. *Id.* at *1.  "The common law of libel at the time the First and Fourteenth Amendments were ratified did not require public figures to satisfy any kind of heightened liability standard as a condition of recovering damages.  Typically, a defamed individual needed only to prove 'a false written publication that subjected him to hatred, contempt, or ridicule.'" *Id.* at *3 *citing among others, Dun & Bradstreet*, 105 S. Ct. 2939 (1985).  Justice Thomas continued, "Far from increasing a public figure's burden in a defamation action, the common law deemed libels against public figures to be, if anything, more serious and injurious than ordinary libels." *Id.* at *4 *citing* 3 Blackstone *124 ("Words also tending to scandalize a magistrate, or person in a public trust, are reputed more highly injurious than when spoken of a private man") (Other citations omitted).  Justice Thomas continued, "There are sound reasons to question whether either the First or Fourteenth Amendment, as originally understood, encompasses an actual-malice standard for public fig`ures or otherwise displaces vast swaths of state defamation law."  He concluded, "We should reconsider our jurisprudence in this area. *Id.* at *5, *6.

others from engaging in conduct similar to that which formed the basis of the lawsuit.

## JURISDICTION AND VENUE

27.     Mingo County Circuit Court has original and general jurisdiction pursuant to West Virginia Code § 51-2-2(b).

28.     Mingo County Circuit Court has personal jurisdiction over Defendant pursuant to West Virginia Code § 56-3-33 for reasons including, but not limited to: that the Defendant transacted business in this state; contracted to supply services or things in this state; caused tortious injury to Plaintiff by an act or omission in this state; caused tortious injury in this state by an act or omission outside this state while regularly doing and/or soliciting business in this state and/or engaging in a persistent course of conduct and/or deriving substantial revenue from goods used or consumed or services rendered in this state.

29.     In addition, Mingo County Circuit Court has personal jurisdiction over the Defendant because of the West Virginia effects of his conduct.  Indeed, West Virginia was the focal point of his comments and tweet, both with respect to the underlying story itself (i.e. Mr. Blankenship's criminal proceedings in West Virginia) and with respect to a significant portion of the harm Mr. Blankenship suffered (i.e. the effect on the West Virginia election).  Accordingly, Defendant purposely directed his actions toward West Virginia and should reasonably have anticipated being haled into court in West Virginia.

30.     Venue is proper in Mingo County Circuit Court pursuant to West Virginia Code § 56-1-1(a)(1).

## PARTIES

31.     Plaintiff Don Blankenship is an individual residing in West Virginia and was in 2018 a candidate for the United States Senate from West Virginia.

Page **9** of **26**

32.     Plaintiff is informed and believes that Defendant Donald Trump, Jr. ("Defendant") is an individual residing in the State of New York.

33.     Plaintiff does not know the true names and capacities of the Defendants sued in this Complaint as Does 1 through 50, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of those Doe Defendants when the same are ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this Complaint, as further set forth herein, and that Plaintiff's damages, as alleged in this Complaint, were proximately caused by these Defendants' conduct.

## GENERAL ALLEGATIONS

### Background

34.     Plaintiff Don Blankenship was born into a poor family in Appalachia, one of four children in a single-parent home.  Mr. Blankenship's first job was as a worker at his mother's small gasoline filling station, which also served as the family's home.  Mr. Blankenship graduated from high school in 1968 and earned a degree in accounting from Marshall University in Huntington, West Virginia in 1972, spending his summers working in the West Virginia coal mines.

35.     Mr. Blankenship worked for ten years in the food business, until he was offered an accounting job with Massey Energy Company in 1982, then a mining concern partly owned by Royal Dutch Shell.  Mr. Blankenship climbed the ranks, and in 1992, became president and CEO of Massey Energy, its first chief executive outside the Massey family.  With Mr. Blankenship at the helm, Massey Energy grew from a family-run outfit into the largest coal producer in West Virginia with billions of dollars in annual revenue.

### The Upper Big Branch Explosion

36.    On April 5, 2010, tragedy struck Raleigh County at the Upper Big Branch Mine.  Flammable gas deep in the mine ignited, causing an explosion which took the lives of twenty-nine miners.

37.    President Obama and others in his administration immediately claimed that the managers of the Upper Big Branch Mine – *i.e.* Mr. Blankenship – were responsible for the explosion.  Just ten days after the accident, President Obama attributed the accident to "a failure first and foremost of management." However, owing to large concentrations of toxic gas, no one accessed the mine to determine the explosion's cause until *long after* the President had pointed the finger of blame.

38.    The Federal Government's investigation into the explosion was conducted by the Mining Safety and Health Administration (MSHA).  However, any conclusions reached by MSHA were inherently suspect because it was necessarily investigating itself.  In the months leading up to the accident, MSHA had required Massey to implement a new ventilation system at the Upper Branch Mine. Airflow into a mine is measured in "cubic feet per minute" (CFM).  At about the time of the accident, the law required that airflow be measured in the mine at 30,000 CFM.  Prior to MSHA requiring ventilation changes, the Upper Branch Mine was measured at four times the legal requirement: 120,000 CFM.  After the MSHA ventilation changes were implemented, the CFM dropped to 50,000 CFM. Thus, the changes required by MSHA cut the mine's airflow by sixty-percent.

39.    Eight months after the disaster, on December 6, 2010, MSHA concluded that a coal bed methane build-up ignited and created an explosion. According to MSHA, the ventilation deficiencies in the mine – *which it had*

*caused* – were a critical factor in causing the explosion.  Nonetheless, MSHA placed the blame on Massey and Mr. Blankenship.

40.     In April 2014, Mr. Blankenship released a documentary which refuted the MSHA's findings and challenged the inherent conflict of having a regulatory agency investigate an explosion where it was likely at fault.  Among other things, the documentary identified powerful scientific evidence, which refuted MSHA's conclusion that the explosion was caused by an influx of methane.  An analysis of the air vented from the mine at the time of the explosion revealed that the explosion almost certainly resulted from a very rare inundation of natural gas through a crack in the mine's floor, which gas would have been swept out of the mine by a stronger airflow, but for MSHA's required pre-explosion ventilation changes.

41.     The Obama Administration was irate over the documentary and almost immediately began a renewed investigation of Mr. Blankenship, following Senator Manchin's demand that Mr. Blankenship be indicted.  Seven months after the documentary was released, on or about November 13, 2014, federal prosecutors from the Obama Administration charged Mr. Blankenship with three felonies, including conspiracy to defraud the Federal mine regulators. He was also charged with a misdemeanor, conspiring to violate mine safety laws.

42.     The Federal Government brought the full weight of its infinite resources to bear on Mr. Blankenship.  The matter went to trial in October 2015 and lasted about two months.

43.     Following lengthy deliberations, the West Virginia jury found Mr. Blankenship innocent on *all* felony charges on December 3, 2015.  The jury convicted him of the misdemeanor offense.

44.     On April 6, 2016, the Judge sentenced Mr. Blankenship to one year in prison.  The Judge refused to stay Mr. Blankenship's sentence pending his appeal, and he served one year at Taft Prison in Kern County, California.

45.     Mr. Blankenship was released from custody in the Spring of 2017.

### Mr. Blankenship Runs For Senate

46.     In January 2018, Mr. Blankenship formally announced his plans to run as a Republican for the U.S. Senate seat held by Senator Joe Manchin, a Democrat.  The Republican primary was scheduled for May 8, 2018.  In light of the then-recent events, Mr. Blankenship's candidacy was viewed as a long-shot.

47.     The fight for the Republican nomination was joined in earnest in January 2018.  The race ultimately pitted Mr. Blankenship against West Virginia Congressman Evan Jenkins and Attorney General Patrick Morrisey.

48.     Mr. Blankenship outperformed expectations in the primary campaign. He campaigned well, expended significant resources in support of his campaign, and produced effective campaign ads.

49.     About a month before the May 8, 2018 primary, based on internal polling, it became clear to Senate Majority Leader McConnell, the NRSC, and others in the GOP Establishment, as well as many in the mainstream media, that Mr. Blankenship had drawn even in the race with the other two contenders. Plaintiff is informed and believes that in the weeks before the May 8th Primary, several meetings occurred, attended by Leader McConnell, members of the NRSC, and others, in which a "menu" describing possible ways to defeat Mr. Blankenship was discussed. Some of these meetings may have occurred in Federal Government offices in violation of Federal Campaign finance laws.  At these meetings, the attendees determined and agreed that Mr. Blankenship's candidacy must be stopped at all costs, including by smearing Mr. Blankenship in the media with

false stories.  At the end of April 2018, Leader McConnell expressed his disdain for Mr. Blankenship this way: "I hope we actually nominate someone who can actually win the election."

### A Scheme Is Implemented to Defeat Mr. Blankenship

50.     On or about March 25, 2018, persons unknown created and carried out a "push poll" wherein phone operators would call potential voters in West Virginia purporting to conduct political polling and asking the voters questions predicated on the idea that Mr. Blankenship was a "felon."  Rather than simply to collect information to assist with the defamation campaign against Mr. Blankenship, the "push poll" also was intended to defame Mr. Blankenship and derail his campaign by planting the false idea in the mind of the voters "polled" that Mr. Blankenship was a felon and/or had been convicted of a felony.

51.     On March 30, 2018, the Democratic Senatorial Campaign Committee published an article which stated: "Republicans are increasingly worried that former coal CEO and ex-felon Don Blankenship could come out on top in the primary, easing Senator Manchin's path to reelection in the fall".

52.     On April 10, 2018, the political action committee ostensibly supporting Mr. Morrisey's campaign –35th PAC – responded to a tweet by Mr. Blankenship, with the following defamatory tweet: "You are also a convicted *felon* hurting West Virginia families."  Mr. Blankenship communicated directly with the major funders of this PAC and advised that this tweet was false.  No correction was ever issued.  At the time this tweet was issued, the authors (and likely the PAC's top donors as well) knew that it was false, but nonetheless proceeded to publish because of their malice toward Mr. Blankenship.

53.     On April 25, 2018, Judge Andrew Napolitano intensified the attacks on Mr. Blankenship and his candidacy by deploying falsehoods on Fox News, an

extremely influential source of information for West Virginia voters.  Judge

Napolitano appeared on Fox News' daytime program *Outnumbered*, alongside host

Marie Harf, among others.  During a segment concerning the West Virginia

Primary, Judge Napolitano took part in the following exchange:

> **Harf:** "Don Blankenship has long been a very polarizing figure
> in West Virginia.  He went to jail, actually, after a really tragic
> coal-mining incident—"
>
> **Napolitano:** "*He went to jail for manslaughter*, after being
> indicted."
>
> **Harf:** "Yes, exactly."

54.     On April 29, 2018, Kevin McLaughlin, now the Executive Director of

the NRSC, appeared on the program *CNN Newsroom* on CNN alongside host Dana

Bash and guest Alex Isenstadt, as part of a segment about Mr. Blankenship's

candidacy.  Mr. McLaughlin was introduced as "working with the National

Republican Party in West Virginia, the last time Republicans tried to beat [current

West Virginia Senator] Joe Manchin" and was titled as a "GOP Political

Strategist."  Several clips of Mr. Blankenship were aired during the segment.

During the segment, McLaughlin stated the following, referring to Mr.

Blankenship:

> **McLaughlin:** "Well, I mean, pick your poison with this guy,
> right? He doesn't live in West Virginia, he's a *convicted felon*,
> you know, he says -"
>
> **Bash:** "He's got a house in Nevada."
>
> **McLaughlin:** "Exactly."

## Mr. Blankenship Crushes His Opponents In The May 1st Nationally-
## Televised Fox Debate Causing The Smears To Escalate

55.     On May 1, 2018, one week before the primary election, Mr.

Blankenship participated in a debate with the other two Primary candidates which

was televised nationally on the Fox News Channel.  The national broadcast, hosted

by Fox News stars Bret Baier and Martha MacCallum, resulted from the intense national interest in the West Virginia primary in political circles, because of concerns about Mr. Blankenship, and a by-then-widespread belief that the Republican primary winner could defeat Democrat Joe Manchin in the general election because of the state's massive support for President Trump in 2016. Mr. Blankenship addressed his conviction and imprisonment right out of the gate, stating in no uncertain terms: "I faced thirty years in prison for a fake charge, and I beat all three of the felonies. ... It's incredible, they sent me to prison for a misdemeanor. I was the only prisoner there that was a misdemeanant." Most objective observers concluded that he won the debate handily and, by some estimates, gained eight points against his opponents.

56.     In the week leading up to the May 8th Primary, there were multiple instances of defamation.

57.     On or about May 3, 2018, members of the NRSC met in Florida to discuss the upcoming Senate primary elections. Defendant Donald Trump Jr., the President's son, was in attendance. The President's son had (and has) considerable influence with the West Virginia voters likely to cast ballots in the May 8th Primary. That afternoon, Mr. Trump tweeted the following:

 **Donald Trump Jr.** ✔ @Donal... · 5/3/18 ∨
I hate to lose. So I'm gonna go out on a limb here and ask the people of West Virginia to make a wise decision and reject Blankenship!

No more fumbles like Alabama. We need to win in November. #wv #wvpol

💬 2,690     🔁 7,496     ♡ 26.4K     ⬆

Page **16** of **26**

58.     Undeterred, Mr. Blankenship issued a press release that afternoon which read:

> The establishment is doing everything they can to keep Joe Manchin in office. I am the only candidate in this race that has beaten Manchin on several political issues. I beat him on the food tax and the  $5.5 billion bond. The establishment needs to stand down in this race, and I will beat Manchin in the fall.

> In this primary, everyone said I could not win, but it is now apparent to the establishment that I will win.

> West Virginians are dying by the hundreds every year from opiate drugs and they will not vote for a drug lobbyist who is also associated with abortionists. They will also not vote for Little Joe (Jenkins) who has been in public office for two decades yet oversees the Congressional district that leads the nation in drug overdose deaths and which is last in economic opportunity.

> I am not just ready to help President Trump drain the swamp— I am the only candidate that is capable of doing so.  If I am not the Republican nominee against Joe Manchin in the fall, Manchin will win.

> No other Republican can beat Manchin without my full support and neither Morrisey nor Jenkins is deserving of my support.

> West Virginians should be able to decide for themselves who we send to the US Senate.

59.    Later that evening, Mr. Trump followed up with a tweet that the

sitting senator, Joe Manchin, had "never run against a felon[,]" referring to Mr.

Blankenship.  The full tweet is as follows:



///

///

60.     Early the next morning, Mr. Blankenship replied to the tweet to correct the record, as follows:



**Don Blankenship**
@DonBlankenship

Replying to @Donald.JTrumpJr

I am sorry that you were misinformed and misled by McConnell's cronies while you were at the RNC meeting yesterday in Miami.

I have never been convicted of a felony and never been convicted of a misdemeanor that I committed.

Just like your father...(1/2)

4:44 AM · 5/4/18 · Twitter for iPad



**Don Blankenship**
@DonBlankenship

Replying to @Donald.JTrumpJr

., I am a victim of fake news and a corrupt Obama DOJ.

When I get to DC, your dad will have no better supporter in his efforts to drain the swamp. Looking forward to working together to Make America Great Again. You will like the real Don Blankenship, just like WV voters.

(2/2)

61.     Despite this, Plaintiff is informed and believes, and based thereon alleges that Defendant never issued a correction or retraction, nor removed his defamatory tweet from public view.

62.     Plaintiff is informed and believes, and based thereon alleges that Defendant published this false tweet at the request of the NRSC and others as part of their efforts to smear Mr. Blankenship and defeat his candidacy.

63.     Over the ensuing days leading up to the Primary, numerous media companies defamed Mr. Blankenship by calling him a "felon".  Among them were conservative outlets like the Washington Times and Fox News, and Fox Business including Neil Cavuto and Stephanie Hamill, and John Layfield.[3]

---

[3]     On the eve of the Primary, the GOP establishment gave further voice to the desire to stop Mr. Blankenship from becoming their nominee.  A BuzzFeed article

## The Other Media Piles On

64.     In April 2018, Chris Hays twice referred to Mr. Blankenship as a felon. In May, S.E. Cupp twice called Mr. Blankenship a "felon" on the air on her program as did Joy Reid on MSNBC.

65.     In May 2019, multiple news outlets and commentators published defamatory statements about Mr. Blankenship.

66.     Mr. Blankenship lost his bid to be the GOP nominee on May 8, 2018. In addition to the injuries to Mr. Blankenship's reputation and other harm visited upon him by the defamatory statements alleged above, these unlawful statements were also a material cause of his loss in the Primary.

## The Smears Continue Even After The Election

67.     Multiple individuals and organizations continued to defame Mr. Blankenship by calling him a felon for months after the election.

## COUNT I

## DEFAMATION/CONSPIRACY TO DEFAME

68.     Plaintiff reincorporates and re-alleges paragraphs 1 through 67 above as though set forth fully herein.

69.     Defendant made statements of fact as set forth above, which were materially false, namely that Mr. Blankenship was a felon.  To the extent

---

on May 7, 2019 includes the following: "Republicans fear Blankenship would jeopardize their ability to compete for a seat that should be one of their best Senate pickup opportunities this year. Internal polling from one of the campaigns opposing him, confirmed to BuzzFeed News, has Blankenship narrowly edging his competitors in the final weekend." And "If Blankenship does pull off a win on Tuesday, Republicans said, it would have broader implications outside of West Virginia." And "It would be a "blow for the party," said former Rep. Tom Davis, who chaired the House Republican campaign arm, taking a great pickup opportunity and making it "a much longer shot." *See "Republicans Are Worried A Race-Baiting Coal Baron Is About To Win A Senate Primary"*, https://www.buzzfeednews.com/article/alexislevinson/don-blankenship-west-virginia-trump-senate-worry

Defendant's above-described statements were statements of opinion (and they were not), each such purported opinion implied the existence of undisclosed defamatory facts as the basis for the opinion, in that such opinion(s) would appear to a reasonable person to be based on the untrue and defamatory facts that Mr. Blankenship was a felon and/or had been convicted of a felony.

70.    Defendant caused to be published the above-described defamatory statements about Mr. Blankenship.

71.    Defendant's statements were defamatory in that they reflected shame, contumely, and disgrace upon Mr. Blankenship by stating that he was a felon.

72.    Defendant's statements were defamatory *per se* in that they were and are incapable of an innocent meaning and charged Mr. Blankenship with the commission of crimes of which he was acquitted, and were imputations as affecting his business, trade, profession, and/or office.

73.    Defendant's statements with respect to the Mr. Blankenship were materially and entirely false in that Mr. Blankenship is not a felon and has never been convicted of a felony, and in fact was acquitted of all felony charges with which he had ever been charged.

74.    Moreover, Defendant's defamatory statement was made in conjunction with reference to the mine disaster, and thus had the additional effect, through inference, implication, *innuendo,* and/or insinuation, of further defaming Mr. Blankenship by falsely attributing to him responsibility for murder.

75.    Defendant's made the defamatory statements with actual malice, that is, actual knowledge of the falsity of his statements or, at a minimum, with reckless and willful disregard of the truth or falsity of the statements.  Among other reasons and without limitation, Defendant's wrongful conduct was motivated by the matters discussed herein above.

Page **21 of 26**

76.     Anyone who consulted the freely-available public records of Mr. Blankenship's trial and conviction (including previous accurate reports of Mr. Blankenship's acquittals), would know that Mr. Blankenship was acquitted of all felony charges, that Mr. Blankenship was convicted only of a misdemeanor, and that Mr. Blankenship has never been convicted of a felony, whether for manslaughter or any other reason.

77.     Defendant intended to cause injury to Mr. Blankenship by publishing the false defamatory statements.

78.     Plaintiff is further informed and believes, and based thereon alleges, that Defendant shared a common plan with the NRSC and other persons currently unknown to Plaintiff (sued herein as Does 1-50), and each of them, for the commission of the tort of defamation.

79.     In particular, they shared the common plan of ensuring that Plaintiff did not win the West Virginia Primary Election.  To that end, they agreed that Defendant would disseminate, and cause and/or encourage others to disseminate the false claim that Plaintiff was a "felon" or "convicted felon."  They knew that this claim was untrue, as Plaintiff had been convicted only of a misdemeanor and had been acquitted of all felony charges.

80.     Mr. Blankenship was damaged by Defendant's defamatory statements in an amount to be proven at trial, but which exceeds the jurisdictional minimum of this Court.

/ / /

/ / /

/ / /

/ / /

/ / /

## COUNT II

## FALSE LIGHT INVASION OF PRIVACY/CONSPIRACY – ALL DEFENDANTS

81.     Plaintiff reincorporates and re-alleges paragraphs 1 through 80 above as though set forth fully herein.

82.     Defendant published matter which placed Mr. Blankenship in a false light before the public, as set forth above, namely that Mr. Blankenship was a felon, and/or that Mr. Blankenship had been convicted of a felony.

83.     Defendant's publication, and the message conveyed thereby to the public that Mr. Blankenship was a felon, and/or that Mr. Blankenship had been convicted of a felony, were untrue and of a nature highly offensive to a reasonable person.

84.     Defendant's publications was widely disseminated throughout West Virginia and in many cases, throughout the country.

85.     Moreover, the publication was made in conjunction with reference to the mine disaster and thus, had the additional effect, through inference, implication, *innuendo* and/or insinuation, of further placing Mr. Blankenship in a false light before the public by falsely attributing to him responsibility for murder.

86.     Defendant made the publications with actual malice, that is, actual knowledge of the falsity of the publications, or at a minimum, with reckless and willful disregard of the truth or falsity of the publications.  Among other reasons and without limitation, Defendant's wrongful conduct was motivated by the matters discussed herein above.

87.     Anyone who consulted the freely-available public records of Mr. Blankenship's trial and conviction (including previous accurate reports of Mr. Blankenship's acquittals), would know that Mr. Blankenship was acquitted of all

felony charges, that Mr. Blankenship was convicted only of a misdemeanor, and that Mr. Blankenship has never been convicted of a felony.

88.     Plaintiff is further informed and believes, and based thereon alleges, that Defendant, shared in a common plan for the commission of the tort of false light invasion of privacy with others, including without limitation the NRSC and Does 1-50, and each of them.

89.     In particular, Defendant, the NRSC, and Does 1-50 shared the common plan of ensuring that Plaintiff did not win the West Virginia Primary Election.  To that end, Defendant, the NRSC, and Does 1-50 agreed that Defendant and others would disseminate and cause and/or encourage others to disseminate the false claim that Plaintiff was a "felon" or "convicted felon."  Defendant, the NRSC, and Does 1-50, and each of them, knew that this claim was untrue, as Plaintiff had been convicted only of a misdemeanor and had been acquitted of all felony charges.

90.     Defendant, the NRSC, and Does 1-50 also committed overt acts in furtherance of the conspiracy by publishing false and misleading claims about Mr. Blankenship which placed him in a false light before the public, including, but not limited to, Defendant's publication of the tweet reproduced above.

91.     Mr. Blankenship was damaged by Defendants' statements placing him in a false light before the public in an amount to be proven at trial, but which exceeds the jurisdictional minimum of this Court.

/ / /

/ / /

/ / /

/ / /

/ / /

## DEMAND

Plaintiff demands judgment against Defendant in excess of the jurisdictional limit of Mingo County Circuit Court for the following damages and other relief:

**AS TO COUNT ONE**

1.      Judgment for general damages for defamation;

2.      Judgment for special damages for defamation;

3.      A permanent injunction against Defendant prohibiting republication of the defamatory statements and requiring the removal of the defamatory statements from public access;

**AS TO COUNT TWO**

4.      Judgment for general damages for false light invasion of privacy;

5.      Judgment for special damages for false light invasion of privacy;

6.      A permanent injunction against Defendant prohibiting republication of the statements placing Plaintiff in a false light before the public and requiring the removal of those statements from public access;

**AS TO ALL COUNTS**

7.      Judgment for punitive damages;

8.      Judgment for emotional distress damages;

9.      Statutory judgment interest pursuant to West Virginia Code § 56-6-31; and

10.      Such further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /





***PLAINTIFF DEMANDS A JURY TRIAL**

**DON BLANKENSHIP**
**By Counsel**

**Jeffrey S. Simpkins, Esq.**
**WVSB #9806**
*SIMPKINS LAW*
**102 E. 2nd Ave.**
**Williamson, WV 25661**
**304.235.2735**
simpkinslawoffice@gmail.com

**Eric P. Early, Esq.**
**(CA State Bar No. 166275, *pro hac vice* application forthcoming)**
**Jeremy Gray, Esq.**
**(CA State Bar No. 150075, *pro hac vice* application forthcoming)**
**Kevin S. Sinclair, Esq.**
**(CA State Bar No. 254069, NV State Bar No. 12277, *pro hac vice* application forthcoming)**
*EARLY SULLIVAN WRIGHT*
*GIZER & McRAE LLP*
**6420 Wilshire Blvd., 17th Floor**
**Los Angeles, CA 90048**
**323.301.4660**
eearly@earlysullivan.com
jgray@earlysullivan.com
ksinclair@earlysullivan.com

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

DONALD TRUMP JR
TRUMP TOWER
725 5TH AVE
NEW YORK, NY 10022

9590 9402 4600 8278 6042 58

2. Article Number (Transfer from service label)
7017 0660 0000 7410 1028

PS Form

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

14-C-51

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

485
JUN 1 0 2019

✓#077
QC✓#029